IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| STORAGECRAFT TECHNOLOGY CORPORATION, a Utah corporation, | MEMORANDUM DECISION AND ORDER |
| Plaintiff/Counterclaim Defendant, vs. | |
| PERSISTENT TELECOM SOLUTIONS, INC., a Delaware corporation, | Case No.  2:14-CV-76-DAK Judge Dale A. Kimball |
| Defendant/Counterclaim Plaintiff. | |

This matter is before the court on Plaintiff StorageCraft Technology Corporation's ("StorageCraft's") Motion for Partial Summary Judgment on Defendant Persistent Telecom Solutions Inc.'s ("Persistent's") Affirmative Defenses. A hearing on the matter was held on May 25, 2016. At the hearing, StorageCraft was represented by Jason E. Greene, Heather M. Sneddon, and John Durham. Persistent was represented by Brandon T. Crowther and Stanley J. Preston. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to the matter.

Also pending before the court is Persistent's Motion for Leave to File an Amended Answer. The motion has been fully briefed. The court concludes that a hearing would not significantly aid its determination of the motion. Accordingly, the court issues the following Memorandum Decision and Order based on the written submissions of the parties and the law and facts relevant to the pending motions.

## BACKGROUND

StorageCraft is a computer software company that specializes in the development and marketing of backup, disaster recovery, and system migration software, including both perpetually licensed software and software for use on a subscription or managed-service basis. In particular, StorageCraft developed and sells the ShadowProtect family of products, which provides its end users with sector-level backup of their computer environments. Once installed on a computer, ShadowProtect makes periodic backups of all data contained on the computer's hard drive. These backups take the form of proprietary Image Files, which are saved to another drive or computer on the same network or a remote network and which can be used to quickly restore the data in the event of a disaster.

Before 2012, Doyenz was a company that, among other things, provided a cloud services product that allowed its customers to upload backup Image Files created by third-party software for storage on off-site servers controlled by Doyenz ("Doyenz's Cloud") and facilitated recovery of those images from the cloud in the event of a disaster. For much of its history, Doyenz's Cloud was designed to work primarily with backup Image Files created by StorageCraft's ShadowProtect products.

On December 30, 2009, Doyenz and StorageCraft entered into their first Software Distribution and License Agreement ("SDLA"), which permitted Doyenz to purchase certain StorageCraft products for the purpose of redistributing them in a bundle with Doyenz's cloud services product to Managed Service Providers ("MSPs"). Shortly after entering into the SDLA, StorageCraft and Doyenz agreed to enter into a license agreement to permit Doyenz to use a group of StorageCraft proprietary tools, referred to as the Data Center Recovery Product

("DCRP"). The DCRP license was incorporated into a new MSP Distribution Agreement that was executed on July 31, 2012, and that expressly superseded the December 2009 SDLA.

Among other things, the DCRP license authorized Doyenz to use four of StorageCraft's proprietary tools. Two of StorageCraft's tools—mount.exe and sbmountapi.dll—are copyrighted ("Mount Tools") while two—image.exe and sbimageapi.dll—are proprietary but not copyrighted ("Image Tools"). Under the Terms of the DCRP license agreement, Doyenz was required to pay a license fee each time it used StorageCraft's proprietary tools to access and recover backup data that was stored in Doyenz's Cloud using StorageCraft's proprietary file format.

During the fall of 2012, StorageCraft consented to the assignment of its rights and obligations under the MSP Distribution Agreement from Doyenz to Persistent, which was in the process of negotiating the purchase of virtually all of Doyenz's assets. On March 18, 2013, StorageCraft notified Persistent that it would not be renewing the MSP Distribution Agreement, which expired on October 31, 2013, and left Persistent without a license to use the DCRP or any of its component parts.

In response to the nonrenewal, Persistent released a new version of its cloud services product called rCloud 4.0, which incorporated a solution ("Replacement Solution") that was intended to eliminate Persistent's need to rely on StorageCraft's DCRP to restore StorageCraft backup data stored in Persistent's cloud. The Replacement Solution relies on StorageCraft's copyrighted tools, which are installed on an end user's machine, to automatically convert proprietary StorageCraft backup files into a new file format, which can be easily accessed and restored by Persistent, before those files are uploaded to Persistent's cloud. Although this conversion process takes place on a machine owned by a StorageCraft and Persistent end user, the process requires the use of StorageCraft's copyrighted tools. However, StorageCraft's end

3

user license agreement does not permit end users to use its copyrighted tools with unauthorized third-party software, such as Persistent's rCloud agent, to convert proprietary StorageCraft Image Files into a non-proprietary format.

After learning of Persistent's continued reliance on StorageCraft's copyrighted tools, StorageCraft initiated this action claiming that Persistent was engaging in direct and contributory copyright infringement. Persistent's answer included, among other things, thirty eight affirmative defenses. After the close of discovery, StorageCraft moved to dismiss six of the affirmative defenses. In response to StorageCraft's motion, Persistent conceded that it would not be pursuing three of the six affirmative defenses mentioned in StorageCraft's motion and encouraged the court to dismiss those three. This memorandum will discuss the remaining three affirmative defenses that are still at issue. This memorandum will also discuss Persistent's motion to amend its answer to add two additional affirmative defenses.

## DISCUSSION

StorageCraft argues that the court should enter summary judgment that Persistent will not be able to establish six of its affirmative defenses, specifically Persistent's 18th (use is permitted by 17 U.S.C. § 117), 19th (use is permitted by the "fair use" doctrine), 22nd (copyrighted tools lack originality), 23rd (copyrighted tools are not protected because they are useful articles), 24th (copyrighted tools are not protected because they are ideas or procedures), and 26th (copyrighted tools were not properly registered). Persistent agrees that the court can dismiss its 18th, 22nd, and 23rd affirmative defenses, but Persistent argues that the other three should not be dismissed. The court will discuss each of the three affirmative defenses still at issue as well as the two affirmative defenses that Persistent is seeking to add as an amendment to its answer.

## STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may seek summary judgment with respect to claims or defenses. *See* Fed. R. Civ. P. 56 (a) ("A party may move for summary judgment identifying each claim or defense . . . on which summary judgment is sought."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."). A party seeking summary judgment always has the initial burden of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c)(1)(A). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* at 324.

After the moving party satisfies its initial summary judgment burden by "indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim," then "the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial." *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (internal quotation marks and citation omitted); *see also Celotex Corp.*, 477 U.S. at 330. The non-moving party "may not rely on mere allegations, or denials, contained in its pleadings or briefs" to defeat summary judgment. *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 982 (10th Cir. 2002).

**NINETEENTH AFFIRMATIVE DEFENSE – FAIR USE DOCTRINE**

The fair use doctrine is codified at 17 U.S.C. § 107, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107 (2012). The statute also provides factors that a court is required to consider when determining if the use of a copyrighted work qualifies as fair use. *See id.* The factors include: (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and" (4) "the effect of the use upon the potential market for or value of the copyrighted work." *Id.* "Fair use is a mixed question of law and fact." *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 560 (1985). Therefore, "[w]here there are no material facts at issue and the parties dispute only the ultimate conclusions to be drawn from those facts, [the court] may draw those conclusions without usurping the function of the jury." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1373 (Fed. Cir. 2014).

The first statutory fair-use factor instructs the court to consider "the purpose and character of the use." 17 U.S.C. § 107(1). Courts have broken down the analysis of this factor into two sub-issues: (1) "whether and to what extent the new work is transformative" and (2) "whether the use serves a commercial purpose." *Oracle Am.*, 750 F.3d at 1374 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). Use of a copyrighted work is considered transformative when it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Id.* (internal quotation marks and citation omitted). Use is considered transformative "only where a defendant changes a plaintiff's

copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation." *Id.* (citation omitted). "A work is not transformative where the user makes no alteration to the *expressive content or message* of the original work." *Id.* (internal quotation marks and citation omitted) (emphasis in original). "Where the use is for the same intrinsic purpose as the copyright holder's . . . such use seriously weakens a claimed fair use." *Id.* at 1375 (internal quotation marks and citation omitted). In terms of whether a work is transformative, the Seventh Circuit has held that "copying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copyright that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws) . . . is not fair use." *Ty, Inc. v. Publications Int's Ltd.*, 292 F.3d 512, 517 (7th Cir. 2002). The more transformative the new work, the less important the other factors, including the commercial character of a work, become, *see, e.g.*, *A.V. v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009), but, in general, "[u]se of the copyrighted work that is commercial 'tends to weigh against a finding of fair use,'" i*d.* (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985)).

In evaluating the second statutory fair-use factor, the nature of the copyrighted work, the transformative purpose inquiry is relevant because "[o]ne cannot assess whether the copying work has an objective that differs from the original without considering both works and their respective objectives." *Author's Guild, Inc. v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015). This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Oracle America, Inc. v. Google Inc.*, 750 F.3d 1339, 1375 (Fed. Cir. 2014) (citation omitted). "Creative expression 'falls within the core of the copyright's protective

purposes.'" *Id.* (quoting *Campbell*, 510 U.S. at 586). In general, "computer programs have both functional and expressive components," and the second factor "arguably supports a finding of fair use" if "the functional components are themselves unprotected" or if "purely functional elements exist in the work and it is necessary to copy the expressive elements in order to perform those functions." *Id.* In this sense, the "functional aspects" of computer programs and the "desire to achieve commercial 'interoperability'" with the computer programs are "relevant to a fair use analysis." *Id.* at 1376-77.

The third statutory fair-use factor directs the court to consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The general principle used in the analysis of this factor is, "as the amount of the copyrighted material that is used increases, the likelihood that the use will constitute a 'fair use' decreases." *Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003). On the other hand, "[i]f the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003). "Under this factor, 'attention turns to the persuasiveness of a parodist's justification for the particular copying done, and the enquiry will harken back to the first of the statutory factors . . . [because] the extent of permissible copying varies with the purpose and character of the use." *Oracle America*, 750 F.3d at 1376 (quoting *Campbell*, 510 U.S. at 586-87). Again, a "desire to achieve commercial 'interoperability'" with the copyrighted computer program is relevant to this factor of the fair-use analysis. *Id.* at 1376-77 (noting that the "functional aspects" of the computer program and the "competitive desire to achieve commercial 'interoperability' . . . are relevant to [a defendant's] fair use defense under the second and third factors of the inquiry").

The fourth statutory fair-use factor directs the court to consider "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "This factor reflects the idea that fair use 'is limited to copying by others which does not materially impair the marketability of the work which is copied.'" *Oracle America*, 750 F.3d at 1376 (quoting *Harper & Row*, 471 U.S. at 566). According to the Supreme Court, this factor is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. The court should consider effects on existing markets, potential markets, and markets for derivative works. *See Campbell*, 510 U.S. at 590. Courts should also "consider the public benefit resulting from a particular use notwithstanding the fact that the alleged infringer may gain commercially." *Sega Enterprises Ltd. V. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992).

To perform the fair-use analysis, the court first notes that the relevant unit of comparison is not necessarily two compilations of computer programs sold as single packages but the "copyrighted work" and the "infringing work." *See, e.g.*, *Oracle America*, 750 F.3d at 1375. Many of Persistent's arguments that the fair-use factors weigh in its favor compare the ShadowProtect program with Persistent's rCloud, In this case, because StorageCraft has a separate copyright for the Mount Tools, the relevant unit of comparison is the Mount Tools and the Replacement Solution, not the ShadowProtect program and rCloud.

Even though Persistent's arguments relied on improper units of comparison, the court concludes that Persistent has demonstrated the existence of genuine disputes of material fact regarding whether Persistent will be able to establish its fair-use defense at trial. Using expert opinion, Persistent demonstrates that its Replacement Solution is likely to maintain, or even increase, the market for the Mount Tools. The Replacement Solution only works when the Mount Tools are also installed on an end user's machine. Therefore, any end user that desires to

use the Replacement Solution either would already need to have or would need to purchase the Mount Tools. StorageCraft disputes that the Replacement Solution either maintains or increases the market for the Mount Tools, especially because StorageCraft licenses its Mount Tools to potential partners, and notes that the argument does not sufficiently take into account derivative markets for the Mount Tools or non-monetary benefits. Because the effect of the Replacement Solution on the market for the Mount Tools is "undoubtedly the single most important element of fair use," this dispute of fact alone may render summary judgment inappropriate. But, in addition to arguing about market effect, Persistent also provides facts that the Mount Tools contain purely functional elements, that the use of the Mount Tools in the Replacement Solution is entirely for the purpose of interoperability with Persistent's programs, and that the use of the Mount Tools results in a public benefit. Although none of Persistent's facts or arguments demonstrates that the fair-use defense is definitely applicable, the court concludes that Persistent has provided enough facts to demonstrate that genuine issues of material fact exist as to whether the fair-use defense is applicable.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE – IDEAS OR PROCEDURES**

Section 102(b) of the Copyright Act provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea [or] procedure . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b) (2012). The Tenth Circuit has clarified that "Section 102(b) does not extinguish the protection accorded a particular expression of an idea merely because that expression is embodied in a method of operation at a higher level of abstraction." *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372 (10th Cir. 1997). "Rather, sections 102(a) & (b) interact to secure ideas for public domain and to set apart an author's particular expression for further scrutiny to ensure that copyright

protection will 'promote the . . . useful Arts.'" *Id.* (quoting U.S. Const. art. 1, § 8, cl. 8.). To determine whether a particular work constitutes an expression that is protected by the Copyright Act, the Tenth Circuit applies the abstraction-filtration-comparison test. *Id.* The test is applied to computer programs by first "dissect[ing] the program according to its varying level of generality," then "filter[ing] out those elements of the program which are unprotectable," and finally "compar[ing] the remaining protectable elements with the allegedly infringing program." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 834 (10th Cir. 1993).

The first step in the test is to dissect the allegedly infringed computer program into its various levels of abstraction. Although this step may require expert testimony, the Tenth Circuit has identified six levels of "generally declining abstraction" that can be applied to many computer programs: (1) main purpose, (2) the program structure and architecture, (3) modules, (4) algorithms and data structure, (5) source code, and (6) object code. *Id.* at 835.

The second step of the test is to "filter out those elements of the program that are not protected by copyright." *Id.* at 836. The purpose of the filtration step is to "eliminate from comparison the unprotectable elements of ideas, processes, facts, public domain information, merger material, *scenes a faire* material, and other unprotectable elements suggested by the particular facts of the program under examination." *Gates Rubber*, 9 F.3d at 834. Object code "will almost always be found to be protectable expression unless the doctrines of merger and *scenes a faire* come into play." *Id.*; *see also Oracle Am.*, 750 F.3d at 1355 ("Both source and object code 'are consistently held protected by a copyright on the program.'" (citation omitted)); *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir. 1992) ("It is now well settled that the literal elements of computer programs, i.e., their source and object codes, are the subject of copyright protection."). The Tenth Circuit describes the doctrines of merger and *scenes a faire*

as part of the "filtration analysis" under Section 102(b) and not as their own independent affirmative defenses. *Mitel, Inc. v. Iqtel, Inc.*, 134 F.3d 1366, 1372 (10th Cir. 1997). "Under the *scenes a faire* doctrine, expressive elements of a work of authorship are not entitled to protection against infringement if they are standard, stock, or common to a topic, or if they necessarily follow from a common theme or setting." *Id.* at 1374. The Tenth Circuit has "extended this traditional copyright doctrine to exclude from protection against infringement those elements of a work that necessarily result from external factors inherent in the subject matter of the work." *Id.* at 1375. In the context of computer programs, the "external factors include hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, industry programming practices, and practices and demands of the industry being serviced." *Id.* "[T]he *scenes a faire* doctrine identifies and excludes from protection against infringement expression whose creation 'flow[ed] naturally from considerations external to the author's creativity.'" *Id.* (citation omitted).

Under the comparison step, "the court must decide whether those protectable portions of the original work that have been copied constitute a substantial part of the original work—i.e. matter that is significant in the plaintiff's program." *Gates Rubber*, 9 F.3d at 838-39.

As an initial matter, StorageCraft argues that Persistent waived its *scenes a faire* affirmative defense because Persistent did not plead the defense in its answer. However, the court concludes that the doctrine of *scenes a faire* is part of the filtration analysis under Section 102(b) of the Copyright Act and is not an independent affirmative defense. Because Persistent pleaded a Section 102(b) affirmative defense, the court concludes that Persistent did not waive its use of the *scenes a faire* doctrine as part of the analysis under Section 102(b).

StorageCraft alleges that Persistent is infringing its copyright in the Mount Tools by copying the object code. Object code is almost always considered protectable unless other doctrines, such as *scenes a faire*, make it unprotectable. Persistent argues that the Mount Tools are not protectable by copyright because Command Line Interfaces (CLIs) are standard, stock, or common in the industry. Specifically, Persistent points to the Opening Report of its expert, Bruce F. Webster, where Mr. Webster says that his analysis of the source code of the Mount Tools led to the opinion that the functions performed by the Mount Tools are "common practice in the IT and software industries and related fields" and are "old technology and not in any way new or novel." Crowther Second Decl. Ex. 1, at 4, 16, ECF No. 108. StorageCraft argues that Mr. Webster was referring to the non-literal elements of the Mount Tools and not to the literal object code, which StorageCraft argues is protectable expression. Although Persistent's expert does not directly say that StorageCraft's object code is standard, stock, or common in the industry, Persistent's expert reviewed the code to opine that the functions performed by the Mount Tools are common practice and old technology. Whether Persistent will succeed in convincing a reasonable jury that the scenes a faire doctrine applies to the Mount Tools is dependent on the detail provided by its expert witness at trial on how commonplace StorageCraft's code is in the industry. However, Persistent has presented enough facts to show that a genuine dispute exists regarding the applicability of the *scenes a faire* doctrine to the Mount Tools.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE – IMPROPER REGISTRATION**

Copyright claims are governed by 17 U.S.C. § 411(a), which provides that "no civil action for infringement of the copyright in any United States work shall be instituted until . . . registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a) (2012). Section 411(b)(1) adds that "[a] certificate of registration satisfies the

requirements of this section . . . regardless of whether the certificate contains any inaccurate information, unless—(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." Section 411(b)(3) further clarifies that failure to properly comply with the registration requirement has no effect on any "rights, obligations, or requirements of a person related to information contained in a registration, except for the institution of and remedies in infringement actions under this section and section 412." The Copyright Act provides that "[i]n any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).

Persistent argues that StorageCraft has alleged copyright infringement of both the Image Tools and the Mount Tools but that it is undisputed that StorageCraft has not registered a copyright for the Image Tools. In its reply, StorageCraft attempted to clarify that, while its complaint identifies the Image Tools as proprietary intellectual property, the complaint does not allege that the use of the Image Tools constitutes direct or contributory copyright infringement. The term "Copyrighted Code" as used in the complaint refers only to the Mount Tools, for which StorageCraft has obtained copyright registrations, and the complaint only alleges infringement with respect to the "Copyrighted Code."

The parties appear to agree that StorageCraft has only registered a copyright for the Mount Tools and not the Image Tools. The parties also appear to agree that the Image Tools cannot benefit from the presumption of validity provided by the Copyright Act. Even though the parties appear to agree on these points, the court sees no need to dismiss the twenty-sixth

affirmative defense. To the extent that StorageCraft attempts to claim copyright protections for programs or tools that do not have a registered copyright, such as the Image Tools, Persistent is able to use improper registration as an affirmative defense.

**MOTION TO AMEND ANSWER TO COMPLAINT**

In addition to the Motion for Partial Summary Judgment, Persistent's Motion for Leave to File an Amended Answer is also pending before the court. Persistent seeks to amend its answer to add two affirmative defenses: (1) that some of StorageCraft's claims are preempted by 17 U.S.C. § 301 and (2) that StorageCraft's copyright claims are barred under the doctrine of copyright misuse.

Amendments to pleadings after the deadline for amending pleadings set in a scheduling order are governed by Federal Rules of Civil Procedure 15(a) and 16(b)(4).[1] Rule 15(a) provides that, outside of amending as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "The grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Bauer v. City & Cty. Of Denver*, No. 15-1275, 2016 WL 1019080, at *4 (10th Cir. Mar. 15, 2016) (unpublished). "The purpose of the Rule is to provide litigants the 'maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (citation omitted). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Bylin*

---

[1] StorageCraft also argues that the "excusable neglect" standard from Federal Rule of Civil Procedure 6(b)(1)(B) should also apply. However, the court agrees with the 11th Circuit Court of Appeals that "when a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 n.2 (11th Cir. 1998). Therefore, the court will not analyze whether Persistent complied with Rule 6(b)(1)(B).

*v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) (citation omitted). "The . . . most important[] factor in deciding a motion to amend the pleadings[] is whether the amendment would prejudice the nonmoving party." *Minter*, 451 F.3d at 1207. "An amendment to a complaint is futile only if the plaintiff can prove no set of facts in support of his amendment that would entitle him to relief." *Home Design Servs., Inc. v. Bohnenkamp Const., Inc.*, No. 08-CV-02391-WDM-KMT, 2009 WL 2055176, at *1 (D. Colo. July 10, 2009); *see also Jefferson Cty. Sch. Dist No. R-1. v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999) ("A proposed amendment is futile if the complaint, as amended, would be subject to dismissal.").

Rule 16 provides that the schedule outlined in a court-issued scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "Rule 16(b)(4) requires a heightened standard in comparison to Rule 15(a)." *Roberts v. C.R. England, Inc.*, No. 2:12-CV-0302, 2013 WL 5275942, at *3 (D. Utah Sept. 18, 2013).

> To establish good cause under Rule 16(b)(4), the moving party must show that the amendment deadline could not have been met even if it had acted with due diligence. Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Furthermore, the lack of prejudice to the nonmovant does not show 'good cause.'

*Carefusion 213, LLC v. Prof'l Disposables, Inc.*, No. CIV.A. 09-2616-KHV, 2010 WL 4004874, at *3-4 (D. Kan. Oct. 12, 2010) (internal quotation marks and citations omitted).

Although the Tenth Circuit has not directly addressed the issue, *see Bylin*, 568 F.3d at 1231, most circuits hold that a party seeking to amend the pleadings after the deadline for amending pleadings in a scheduling order must satisfy the Rule 16 good-cause requirement. *See, e.g.*, *Hawthorne Land Co. v. Occidental Chem. Corp.*, 431 F.3d 221, 227 (5th Cir. 2005); *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000); *In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437-438 (8th Cir.

1999); *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992). "[The Tenth Circuit] adopted a similar interpretation of Rule 16(b)'s 'good cause' requirement in the context of counterclaims asserted after the scheduling order deadline, *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1518-19 (10th Cir. 1990), but has not done so in the context of an amendment to the complaint." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 n. 4 (10th Cir. 2006).

District courts in the Tenth Circuit have consistently applied a two-step analysis based on both Rule 16(b) and Rule 15(a) when deciding a motion to amend that is filed beyond the scheduling order deadline. *See, e.g.*, *Carefusion 213, LLC v. Prof'l Disposables, Inc.*, No. CIV.A. 09-2626-KHV, 2010 WL 4004874, at *3-4 (D. Kan. Oct. 12, 2010); *Roberts v. C.R. England, Inc.*, No. 2:12-CV-0302, 2013 WL 5275942, at *2 (D. Utah Sept. 18, 2013). "Thus, when a motion to amend is filed beyond the scheduling order deadline, [the] Court will first determine whether the moving party has established 'good cause' within the meaning of Rule 16(b)(4) so as to justify allowing the untimely motion. Only after determining that good cause has been established will the Court proceed to determine if the more liberal Rule 15(a) standard for amendment has been satisfied." *Carefusion 213*, 2010 WL 4004874, at *3-4; *see also Roberts*, 2013 WL 5275942, at *2 ("Although there is a 'rough similarity' between the undue delay standard of Rule 15 and the good cause standard of Rule 16, they are distinct provisions under the Federal Rules and thus the Court finds the more reasoned approach is to consider the requirements of each rule separately in relation to Plaintiffs' motion.").

As it relates to the good-cause standard under Rule 16, Persistent argues that it discovered these defenses after learning of factual information during depositions and discussing the information with Persistent's expert following the close of fact discovery and the completion

17

of initial expert reports. StorageCraft argues that all of the core operative facts relevant to Persistent's motion are contained in StorageCraft's Amended Complaint and that Persistent knew, or should have known, of the existence of the purported defenses. Although Persistent arguably may have been able to discover these defenses earlier in the proceedings, discussing information from depositions with experts following initial expert reports shows due diligence by Persistent and does not show that Persistent was careless. Therefore, the court concludes that Persistent has demonstrated good cause for requesting an amendment to its answer after the deadline for amending pleadings in the court's scheduling order.

    In terms of whether Persistent's request to amend it answer complies with the standard in Rule 15(a), Persistent argues that its amendments have merit, will not prejudice StorageCraft, and should not require any additional discovery by either party. StorageCraft argues that allowing an amendment this late in the proceedings will prejudice StorageCraft and that Persistent's proposed amendment would be futile because the new defenses lack merit. However, StorageCraft has not provided enough facts or arguments to show that it will be significantly prejudiced by Persistent's proposed amendments nor has StorageCraft shown that Persistent can prove no set of facts in support of its proposed affirmative defenses that would entitle Persistent to relief. Therefore, the court concludes that justice requires that Persistent be allowed to amend its answer to provide the maximum opportunity for the claims to be decided on the merits.

## CONCLUSION

    For the foregoing reasons, IT IS HEREBY ORDERED that StorageCraft's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. The court dismisses Persistent's 18th, 22nd, and 23rd affirmative defenses, but the court does not dismiss Persistent's

19th, 24th, and 26th affirmative defenses. The court further orders that Persistent's Motion for Leave to File an Amended Answer is GRANTED.

DATED this 17th day of June, 2016.

BY THE COURT:

*[signature: Dale A. Kimball]*

DALE A. KIMBALL
United States District Judge